IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION d/b/a Amtrak, <br> 1 Massachusetts Avenue, N.W. <br> Washington, D.C. 20001 <br><br> Plaintiff, <br><br> v. <br><br> SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY, <br> 1234 Market Street, 5th Floor <br> Philadelphia, PA 19107 <br><br> Defendant. | Civil Action No. _____ |

**COMPLAINT FOR DECLARATORY RELIEF**

Plaintiff National Railroad Passenger Corporation ("Amtrak") seeks a declaration from this Court with respect to Amtrak's rights to real property in Pennsylvania that it acquired under the Regional Rail Reorganization Act of 1973. Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") has wrongfully asserted possession of an easement. SEPTA claims that the purported easement grants it the right to operate its commuter passenger service using terminals, stations, platforms, and parking areas owned by Amtrak. In fact, SEPTA has been permitted to use those facilities for the past 35 years only because of a lease agreement it executed with Amtrak. That lease is now expiring, and SEPTA has asserted that it owns an easement in order to gain leverage in lease negotiations.

The negotiations for a new lease governing SEPTA's right to use these properties are now at an impasse, and the Court's intervention is necessary. A justiciable controversy exists as to whether SEPTA possesses a commuter easement that is ripe for determination by this Court,

and resolution will allow the parties to return to the negotiating table in good faith with a clear understanding of their respective property interests.

## JURISDICTION

1. This is a civil action brought pursuant to the Regional Rail Reorganization Act of 1973, which was codified as 49 USC §§ 24101 *et seq*. ("3R Act"), to obtain an order declaring the possession of an easement attached to the deeds that conveyed real property to Amtrak under the authority of the 3R Act.  Under 45 U.S.C. § 719(e)(2), an action involving the interpretation of those deeds is subject to the original and exclusive jurisdiction of the Special Court that the 3R Act established to adjudicate such disputes.  45 U.S.C. § 719(b)(2) abolished the Special Court as a separate tribunal and transferred the Special Court's original and exclusive jurisdiction to the United States District Court for the District of Columbia.  This Court has jurisdiction under 45 U.S.C. §§ 719(b)(2) and 719(e)(2).

2. Under 45 U.S.C. § 719(b)(1), when exercising the power of the Special Court, the United States District Court for the District of Columbia sits as a district court in all districts.

## PARTIES

3. Plaintiff Amtrak is a corporation organized under the laws of the District of Columbia with its principal place of business located at 1 Massachusetts Avenue, N.W., Washington, D.C. 20001.  Amtrak's principal business is to provide intercity passenger rail transportation to the public.

4. Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA") is a body corporate and politic organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located in Philadelphia, Pennsylvania.  SEPTA is engaged in the business of providing commuter transportation to the public.

## **GENERAL ALLEGATIONS**

5. By the early 1970s, railroads operating in the Northeast and Midwest faced a fundamental economic crisis that threatened the railroads' existence, with many of the major railroads filing for bankruptcy reorganization. To revive the failing industry, Congress enacted the 3R Act. The 3R Act authorized the creation of Amtrak for the purpose of providing intercity passenger rail service.

6. Among other things, the 3R Act created an entity to prepare a Final System Plan that would designate the rail properties, owned by the bankrupt railroads, that were needed to provide continued rail service. 45 U.S.C. §§ 711(a), 716.

7. The 3R Act also created the Consolidated Rail Corporation ("Conrail"), and directed the conveyance of all of the rail properties designated in the Final System Plan to Conrail from the railroads' bankruptcy estates. 45 U.S.C. §§ 741(a), 743(b).

8. In 1976, Congress enacted the Railroad Revitalization and Regulatory Reform Act, P.L. No. 94-210 (the "4R Act"), which, among other things, approved the Final System Plan and directed Amtrak to acquire the Northeast Corridor rail line, which generally consists of the rail line running from Washington, D.C. to Boston, Massachusetts, and includes the rail lines from Philadelphia to Harrisburg, PA (the "NEC").

9. In accordance with the 4R Act and the Final System Plan, Conrail retained the properties used for freight transportation, but transferred the NEC properties to Amtrak under a series of deeds effective April 1, 1976 (the "NEC Properties").

10. On March 31, 1976, Amtrak and Conrail entered into an Agreement of Purchase under which Conrail agreed to convey the NEC Properties to Amtrak (the "Purchase Agreement").

11. Amtrak, in turn, granted to Conrail certain easements and rights on the NEC Properties, which included a Commuter Passenger Service Easement (the "Commuter Easement"). The Commuter Easement was attached as Exhibit C to each of the deeds conveying the NEC Properties to Amtrak.

12. The Commuter Easement reserved to Conrail the right "to operate upon the [NEC Properties] . . . commuter passenger service to the full extent required by the [3R] Act."

13. The Commuter Easement also expressly stated: "[I]n the event that [Conrail] shall elect to abandon or assign the Commuter Passenger Service Easement, in whole or in part, other than to a subsidiary, affiliate or successor entity, [Amtrak] shall have a first option to acquire such easement, or portion thereof, at the purchase price of one dollar ($1.00)" (hereafter, the "Amtrak's Option").

14. In conjunction with the Purchase Agreement and the conveyance of the NEC Properties, Amtrak and Conrail entered into a Northeast Corridor Commuter Operating Agreement on April 1, 1976 (the "COA"). The Commuter Easement was attached to the COA as an exhibit and was incorporated by reference as an integral part of the agreement. The COA contained the same language defining the Commuter Easement as the language used in the Purchase Agreement and the deeds conveying the NEC Properties to Amtrak.

15. The COA contained a dispute resolution provision that required Amtrak and Conrail to enter into binding arbitration for "any claim or controversy between Amtrak and Conrail concerning the interpretation, application or implementation of this Agreement," which included disputes with respect to the Commuter Easement.

16. The commuter rail stations on the NEC that service Philadelphia and its surrounding suburbs are located in five counties: Bucks County, Chester County, Delaware County, Montgomery County, and Philadelphia County (the "Philadelphia-area Counties").

17. The NEC Properties in the Philadelphia-area Counties were transferred from Conrail to Amtrak in five deeds, one for each county in which a station resided: the Bucks County Deed, the Montgomery County Deed, the Philadelphia County Deed, the Delaware County Deed, and the Chester County Deed (hereafter, the "County Deeds").  Each County Deed was dated October 11, 1978.

18. The County Deeds each contained identical language as to what Conrail conveyed to Amtrak.  They state that Conrail, as Grantor, granted and conveyed to Amtrak, as Grantee, "[a]ll of the Grantor's right, title and interest, legal and equitable, in and to the real property located in the County of [Bucks/Chester/Delaware/Montgomery/Philadelphia] in the Commonwealth of Pennsylvania as described in Exhibit A attached to this Deed as a part hereof, together with all the appurtenances, hereditaments, franchises, improvements, fixtures, licenses, leaseholds, reversions, easements, rights under operating, trackage and joint facility agreements, rents, issues, profits and other interests and items belonging to or in any way appertaining to such real property."

19. The 3R Act required Conrail, upon the request of a State, local or regional transportation authority, to provide commuter passenger service on, *inter alia*, the NEC Properties in the Philadelphia-area Counties.  *See* 45 U.S.C.A. § 744(e)(4).

20. Conrail had the following enumerated rights under the Commuter Easement:

    a. the operation of commuter passenger trains, cars and locomotives;

    b. the ability to provide commuter passenger service to the extent required by the 3R Act;

    c. the use of terminals and stations (and replacements thereof) for such commuter passenger service, jointly with Amtrak's use thereof, including waiting areas, parking areas, facilities for sale of tickets and other related passenger facilities within, contiguous, or adjacent to the terminals and stations;

    d. use of appropriate portions of the maintenance of equipment facilities (and replacements thereof) for equipment used in provision of such commuter passenger service; and

    e. access to permit the exercise of the foregoing easements and rights.

21. On August 13, 1981, Congress enacted the Northeast Rail Service Act ("NERSA"), which, among other things, had the stated purpose of providing for the "transfer of Conrail commuter service responsibilities to one or more entities whose principal purpose is the provision of commuter service." 45 U.S.C.A. § 1102. Pursuant to this purpose, Congress, in Section 1136 of NERSA, terminated Conrail's commuter passenger service obligations effective January 1, 1983. 45 U.S.C. § 744a; 95 Stat. 357, 934 (1981).

22. To replace Conrail, Congress provided in Section 1137 of NERSA for the establishment of the Amtrak Commuter Services Corporation ("Amtrak Commuter") as the entity statutorily required to provide commuter service if not offered by the State, local or regional transportation authority. 95 Stat. 357, 934 (1981).

23. Section 1137 of NERSA (§506(a)) also stated that each State, local or regional transportation authority should be given an opportunity to "operate its own commuter service or to contract with Amtrak Commuter for the operation of such service." 95 Stat. 357, 934 (1981).

24. The entity "Amtrak Commuter" never came into existence because the State, local or regional transportation authorities, including SEPTA, chose to operate their own commuter services and were granted access to and use of Amtrak's NEC Properties and rails through independently negotiated agreements, licenses, and leases.

25. In August 1982, Amtrak learned that Conrail and SEPTA were negotiating the transition of commuter passenger service from Conrail to SEPTA for stations on the NEC Properties in the Philadelphia-area Counties and the conveyance of the Commuter Easement from Conrail to SEPTA.

26. On September 2, 1982, Amtrak informed Conrail that Conrail had no authority to convey the Commuter Easement, or any portion of the Easement, to SEPTA.

27. On November 2, 1982, Amtrak informed SEPTA that Conrail had no authority to convey the Commuter Easement, or any portion of the Easement, to SEPTA.

28. On December 20, 1982, Conrail informed Amtrak that it intended to execute and deliver a Quitclaim Deed to SEPTA on or prior to December 31, 1982.

29. On December 22, 1982, Amtrak sent a letter to Conrail that reiterated that Conrail could not assign or convey the Commuter Easement to SEPTA. Amtrak further informed Conrail that, because of Conrail's expressed intention to assign portions of the Commuter Easement to an entity which is not a "successor" within the meaning of the Commuter Easement, Amtrak was exercising Amtrak's Option to acquire those portions of the Commuter Easement that Conrail was purportedly assigning to SEPTA. With its letter, Amtrak tendered the sum of one dollar in accordance with the Commuter Easement's terms.

30. On December 28, 1982, Conrail attempted to reject Amtrak's tender of payment for the acquisition of the portions of the Commuter Easement in violation of the terms of the Commuter Easement, the County Deeds, and the COA. Conrail ultimately executed a Quitclaim Deed of Easement, dated "as of" January 1, 1983, that purported to assign a portion of the Commuter Easement to SEPTA, in violation of Amtrak's Option.

31. On December 29, 1982, Amtrak initiated an arbitration proceeding before the National Arbitration Panel (NAP Case No. 61), pursuant to Article Four, Section 4.1 of the COA, seeking a declaration that Conrail's purported assignment of portions of the Commuter Easement to SEPTA was subject to Amtrak's Option, which had been validly exercised.

32. On May 31, 1983, the National Arbitration Panel issued a decision in Amtrak's favor. The Panel ruled that (i) no legally effective assignment of the Commuter Easement was made by Conrail to SEPTA within the meaning of the proviso contained in paragraph (e) of the Commuter Easement; (ii) the "quitclaim" of any right Conrail might have under the Commuter Easement constituted an election to "abandon" within the meaning of the Commuter Easement; (iii) Amtrak's option to "acquire" the disputed portions of the Commuter Easement was properly exercised; and (iv) Conrail should honor Amtrak's exercise of its option by executing a similar quitclaim document in favor of Amtrak.

33. As confirmed by the National Arbitration Panel's decision, Amtrak's Option was properly exercised on December 22, 1982, and Amtrak thereby acquired the Commuter Easement that Conrail possessed. That acquisition terminated the Commuter Easement because Amtrak possessed the fee that was burdened by the Easement.

34. As of January 1, 1983, Conrail ceased operating commuter passenger services pursuant to the NERSA, and SEPTA commenced its voluntary operation of the commuter passenger services using the tracks, stations, and other facilities at stations on the NEC Properties in the Philadelphia-area Counties.

35. SEPTA already had access to 16 Amtrak-owned stations pursuant to a station lease the parties entered into on June 13, 1980, in Rosemont, Downingtown, Croydon, Chester,

Narberth, Merion, Wynnewood, Ardmore, Haverford, Bridesburg, Tacony, Strafford, Berwyn, Malvern, Bristol, and Exton (the "1980 Lease").

36. On December 23, 1982, Amtrak and SEPTA, in anticipation of the termination of Conrail's commuter obligations, also entered into the Northeast Corridor Access and Service Agreement ("Access Agreement"), in which the parties acknowledged that SEPTA's operating agreement with Conrail was set to expire on January 1, 1983. SEPTA sought to enter into a new agreement to have Amtrak continue to provide the access and services that Conrail had provided to SEPTA up to this point. The parties agreed that "[f]or the term of this [Access Agreement], Amtrak shall permit SEPTA access to the NEC and provide the type and level of services currently provided to SEPTA by Conrail…over three rail lines as follows: 1) between Marcus Hook and Arsenal interlocking; 2) between Zoo and Trenton, and 3) between Zoo and Paoli (including trains on SEPTA's Manayunk Branch which utilize Amtrak facilities between 30th Street Station and Overbrook)."

37. In return for the services and access Amtrak provided, SEPTA agreed to pay Amtrak $795,000 per month. The parties agreed that the Access Agreement would remain in effect "at least through December 31, 1984." The Access Agreement, as amended, was renewed every year and remains in effect.

38. In addition to the Access Agreement, the parties also entered into three License Agreements in December 1982 (collectively, the "December License Agreements").

39. The first License Agreement was dated December 15, 1982, and granted SEPTA access to the following 16 stations owned by Amtrak on the terms and conditions set forth in the License Agreement:  Bryn Mawr, Devon, Folcroft, Glenolden, Levittown, Marcus Hook, Moore

(Prospect Park), Norwood, Overbrook, Paoli, Radnor, Ridley Park, Torresdale, Villanova, Wayne, and 30th Street Station (SEPTA ticket office).

40. The second License Agreement also was dated December 31, 1982, and granted SEPTA access to the Amtrak-owned railroad facility generally known as the Paoli Yard and Shop on the terms and conditions set forth in the License Agreement.

41. The third License Agreement also was dated December 31, 1982, and granted SEPTA access to the following 16 Amtrak-owned stations on the terms and conditions set forth in the License Agreement:  Frankford Junction, Frankford, Wissinoming, Holmesburg Junction, Andalusia, Corwell Heights, Eddington, Darby, Curtis Park, Sharon Hill, Crum Lynne, Eddystone, St. Davids, Daylesford, Lamokin Street, and Highland Avenue.

42. The December License Agreements had terms of 120 days and provided that "[u]pon execution of this License Agreement, Amtrak and [SEPTA] shall promptly enter into negotiations to extend [SEPTA's] use and occupancy of the aforesaid property pursuant to a lease for a term of years."

43. In August 1983, Amtrak informed SEPTA of the National Arbitration Panel's ruling.

44. Then, on September 29, 1983, Conrail signed a Quitclaim Deed of Easement that conveyed the Commuter Easement to Amtrak in accordance with the National Arbitration Panel's ruling and the exercise of Amtrak's Option ("Quitclaim to Amtrak").  Conrail also provided SEPTA's General Counsel with a copy of the Quitclaim to Amtrak on the same day.

45. On January 1, 1987, Amtrak and SEPTA executed a lease covering 47 stations located on the NEC Properties in the Philadelphia-area Counties (the "Station Lease").  This

lease replaced the previous agreements, including the 1980 Lease, which was terminated on the same day the Station Lease went into effect.

46.     The Station Lease granted SEPTA access to the NEC stations, including stations in the following locations:

| | | | |
|---|---|---|---|
| 1) Ardmore | 14) Rosemont | 26) Croydon | 38) Lamokin St. |
| 2) Berwyn | 15) St. Davids | 27) Crum Lynne | 39) Levittown |
| 3) Bryn Mawr | 16) Strafford | 28) Curtis Park | 40) Marcus Hook |
| 4) Daylesford | 17) Villanova | 29) Darby | 41) Moore |
| 5) Devon | 18) Wayne | 30) Eddington | 42) Norwood |
| 6) Downingtown | 19) Whitford | 31) Eddystone | 43) Ridley Park |
| 7) Exton | 20) Wynnewood | 32) Folcroft | 44) Sharon Hill |
| 8) Haverford | 21) Andalusia | 33) Frankford | 45) Tacony |
| 9) Malvern | 22) Bridesburg | 34) Frankford Jct. | 46) Torresdale |
| 10) Merion | 23) Bristol | 35) Glenolden | 47) Wissinoming |
| 11) Narberth | 24) Chester | 36) Highland Ave. | |
| 12) Overbrook | 25) Cornwells Heights | 37) Holmesburg Jct. | |
| 13) Radnor | | | |

The above list constitutes the locations of the original 47 stations in the Station Lease. Five stations are no longer in service and not subject to this dispute: Andalusia, Frankford, Frankford Jct., Lamokin St., and Wissinoming. Three additional stations have been added to the Station Lease through amendments: Thorndale, Paoli, and North Philadelphia. The stations covered by the Station Lease will collectively be referred to as the "Leased Stations."

47.     The Station Lease incorporates and defines each of the Leased Stations collectively as the "Demised Premises," which cover:

> only those areas of Amtrak property on which are located railroad structures, including but not limited to: station buildings; platforms; passenger tunnels or overhead pedestrian walkways; and parking spaces which are paved, marked and designated for exclusive use of intercity and commuter rail passengers. The Demised Premises shall also include necessary access and appurtenances to the extent that such are presently and directly utilized by SEPTA for commuter passenger operations, and any air-conditioning, heating, sprinkler system, plumbing, wiring facilities employed in the use or occupancy thereof by Lessee. Lessee's use or occupancy of the Demised Premises shall not inhibit or restrict the full utilization by Amtrak of any contiguous area for its own use or benefit, or use by others as may be provided for hereinafter.

These are the very same terminals and stations, including their waiting areas, parking areas, facilities for sale of tickets and other related passenger facilities within, contiguous, or adjacent to the terminals and stations, for which Conrail possessed a Commuter Easement that SEPTA now claims to possess.

48. The Station Lease requires SEPTA to pay rent to Amtrak of $1.00 per annum plus certain enumerated charges for access to and use of the Leased Stations.

## THE PARTIES' DISPUTE

49. The Station Lease had an original term of 30 years that was set to end on December 31, 2016.

50. The Parties started negotiating a new lease in 2015 in anticipation of the Station Lease expiring. In an effort to finalize the new lease agreement, the Stations Lease was extended multiple time through amendments, which extended the expiration date to March 29, 2019.

51. As part of the negotiations, Amtrak explained that it wanted to exercise its full and unencumbered rights as owner of the Leased Stations. This includes the ability to lease and charge market rent for these properties, or, if it is unable to negotiate a lease for market rent in good faith, develop or sell the properties.

52. SEPTA responded by stating that it did not need to extend the Station Lease with Amtrak to continue using the Leased Stations because it possessed the Commuter Easement Conrail purportedly conveyed to SEPTA. SEPTA has claimed that the Commuter Easement gives it a right to access and use the Leased Stations without Amtrak's consent or approval. SEPTA also contends that it has no obligation to pay Amtrak rent, since it can access and use the Stations pursuant to the Commuter Easement. Finally, SEPTA has argued that Amtrak may not

develop or sell the NEC Properties in any way that may affect SEPTA's rights under the Commuter Easement.

53. SEPTA's assertion that it possesses Conrail's Commuter Easement has created an impasse in the good faith negotiations for a new lease to maintain commuter passenger services in the Philadelphia-area Counties.

54. Throughout its relationship with SEPTA, Amtrak has understood that it has possessed the Leased Stations on the NEC Properties, unburdened by the Commuter Easement. It further understood that it gave SEPTA access to the Leased Stations pursuant to the 1980 Lease, the December License Agreements, the Access Agreement, and the Station Lease.

55. SEPTA's current position contradicts the National Arbitration Panel's decision, the conveyance of the County Deeds from Conrail to Amtrak, Conrail's Quitclaim to Amtrak, and the exercise of Amtrak's Option for the Commuter Easement.

56. SEPTA's actions contradict and are inconsistent with its new assertion that it owns the Commuter Easement. SEPTA signed and relied on the 1980 Lease, the December License Agreements, the Access Agreement, and the Station Lease, which would not have been necessary had it still possessed the Commuter Easement. It paid rent to Amtrak for over 30 years under the Station Lease before raising a claim that such payments were not necessary or required because it possesses the Commuter Easement. SEPTA also continues to make payments to Amtrak under the Access Agreement, as amended.

57. The specific terms of these agreements are also inconsistent with SEPTA's new position that it holds the Commuter Easement. For example:

    a.    SEPTA did not cancel the 1980 Lease until a new lease was in place on January 1, 1987, despite the fact that Conrail purportedly assigned and transferred the Commuter Easement to SEPTA in 1983.

    b.    There is no reference to the existence of a Commuter Easement in the Station Lease, despite the fact that SEPTA claims to have possessed it since January 1, 1983.  In addition, SEPTA agreed in the Station Lease that Amtrak is the "Lessor" and that the stations are "owned by the Lessor."

    c.    The Station Lease provided that "[w]ithin the boundaries of the Demised Premises, SEPTA shall have the use of all areas and facilities as approved by Lessor [Amtrak], subject to the rights of Lessor as set forth in this lease and to the present rights of others, if any, to use any roadway or portion thereof which may be located upon or which may traverse the Demised Premises."

    d.    The agreements outlined the parties' intent and understanding of SEPTA's right to access and use the Stations and NEC Properties.  The Station Lease specifically stated that SEPTA's rights included access to the "station buildings; platforms; passenger tunnels or overhead pedestrian walkways; and parking spaces which are paved, marked and designated for exclusive use of intercity and commuter rail passengers" as well as including "necessary access and appurtenances to the extent that such are presently and directly utilized by SEPTA for commuter passenger operations."

    e.    The Station Lease recognized Amtrak's right to reoccupy, redevelop, or license to third parties for redevelopment as long as such redevelopment shall not restrict SEPTA's operation of facilities deemed essential in the final plan the Parties

agreed to prepare following execution of the Station Lease, which is distinct from the Final Plan developed under the 3R and 4R Acts. Notably, the parties never completed the final plan described in the Station Lease, leaving "essential facilities" as an undefined term.

f. The Station Lease contains a provision requiring SEPTA upon the expiration of the Lease to remove all materials, buildings and structures, including foundations, placed there by SEPTA that do not belong to Amtrak, at SEPTA's sole cost and expense. If SEPTA fails to do this, Amtrak can (a) complete the removal at SEPTA's expense, (b) sell the property and keep the proceeds, or (c) take ownership of the property and use it for any purpose.

g. The parties agreed that the Station Lease "constitutes the entire agreement between the parties with respect to the Demised Premises." SEPTA never made any reservation of or reference to the Commuter Easement at the time the Station Lease was negotiated or signed, thus indicating that it had no other rights to the Demised Premises.

h. The Access Agreement provides if SEPTA is unable to meet its payment obligations in full, "the parties specifically agree that Amtrak shall have the right to terminate immediately all access and services provided to SEPTA."

i. The December License Agreements recognize that it is Amtrak's right to "permit" SEPTA to access the station properties on the terms laid out in the agreements "for purposes of providing commuter rail services."

j.  The December License Agreements directed SEPTA and Amtrak to "promptly enter into negotiations to extend [SEPTA's] use and occupancy of the aforesaid property pursuant to a lease for a term of years."

k.  Amtrak also had the ability under the December License Agreements to, "in its sole discretion, and with or without notice, postpone or cancel the exercise by [SEPTA] of all or part of the License granted herein for causes beyond Amtrak's control."

## COUNT I
### Declaratory Relief

58. The allegations contained in Paragraphs 1 through 57 are incorporated herein by reference.

59. SEPTA does not have any right to use or occupy the NEC Properties (or the Leased Stations) under a "Commuter Easement" for one or more of the reasons set forth in paragraphs 60-66 below. Any of these reasons are independently sufficient to deny SEPTA's claim that it possesses the Commuter Easement.

60. NERSA's termination of Conrail's statutory commuter service effectuated an "abandonment" of the Commuter Easement by Conrail, within the meaning of the Commuter Easement.

61. SEPTA was not a "subsidiary, affiliate, or successor entity" of Conrail within the meaning of the Commuter Easement.

62. Amtrak properly exercised Amtrak's Option to acquire the Commuter Easement from Conrail as of January 1, 1983, as the National Arbitration Panel confirmed on May 31, 1983.

63. Conrail's Quitclaim to Amtrak conveyed the Commuter Easement to Amtrak in accordance with the National Arbitration Panel's ruling and the exercise of Amtrak's Option. SEPTA therefore cannot own the Commuter Easement or claim that it has a right to access the Leased Stations under the Commuter Easement.

64. It was not possible for Conrail to assign the Commuter Easement to SEPTA, because that Easement was, by its own terms and as set forth in the COA and County Deeds, limited to commuter services required to be provided by federal statute. SEPTA does not operate commuter passenger services under any mandatory federal statutory obligation.

65. SEPTA has admitted in the Station Lease that it does not possess the Commuter Easement.

66. SEPTA has waived any right to assert ownership of the Commuter Easement, or any rights thereunder, based on conduct inconsistent therewith, including, but not limited to, the conduct enumerated in paragraphs 56 and 57 above.

67. Amtrak intends to exercise its full and unencumbered rights as owner of the Leased Stations, which include the ability to lease and charge market rent for access to the Stations, or, if it is unable to negotiate a lease for market rent, exercise its right to develop or sell the properties. Nevertheless, Amtrak desires to continue providing SEPTA with access to the Leased Stations through the negotiation of a new lease, so SEPTA can continue providing commuter passenger services in the Philadelphia-area Counties. However, such access is not by right under an easement, and must be pursuant to terms agreed to by Amtrak.

68. A justiciable controversy exists among the parties as to who owns the Commuter Easement that is ripe for determination by this Court.

69. For the foregoing reasons, the Court should issue a declaratory judgment pursuant to 28 U.S.C. § 2201, holding that SEPTA does not own the Commuter Easement and thereby may not use the Commuter Easement as justification for its continued access to the NEC Properties or use of the Leased Stations after the Station Lease's term expires.

## PRAYER FOR RELIEF

Amtrak therefore respectfully requests the Court to (i) enter a declaratory judgment that SEPTA does not possess the Commuter Easement; and (ii) award Amtrak such other relief as the Court deems just and proper.

February 28, 2019              Respectfully submitted,

/s/ Neil K. Gilman
Neil K. Gilman (D.C. Bar No. 449226)
Christopher J. Dufek (D.C. Bar No. 1020954)
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave., N.W.
Washington, D.C. 20037
Tel: (202) 955-1500
ngilman@huntonAK.com
cdufek@huntonAK.com

Thomas R. Waskom (Bar ID No. VA066)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
twaskom@huntonAK.com

Attorneys for Plaintiff