# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY,<br><br>Defendant. | Case No. 1:19-cv-00537 (TNM) |

## MEMORANDUM ORDER

This is a case about a relationship between two railroad authorities that has veered off track over a property dispute. The Southeastern Pennsylvania Transportation Authority ("SEPTA") believes it possesses an easement granting it the right to provide commuter passenger services using property owned by the National Railroad Passenger Corporation ("Amtrak"). Amtrak disagrees. It seeks a declaratory judgment that SEPTA does not own the easement. In response, SEPTA has moved for a dismissal of Amtrak's Complaint for lack of subject matter jurisdiction. Because the Court finds that it has jurisdiction to consider the merits of the parties' arguments, it denies SEPTA's Motion.

**I.**

In the early 1970s, several major railroads in the Northeast filed for bankruptcy. To ensure continued service in the region, Congress passed the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 *et seq*. ("3R Act"). The 3R Act created the Consolidated Rail Corporation ("Conrail"). *Id*. § 741. Through a "Final System Plan," the Act directed Conrail to acquire and

operate the bankrupt railroads' rail lines. *See id*. § 716; P.L. No. 94-210. The Plan also required Conrail to convey some of these properties to other rail authorities, including Amtrak. *Id*. For property transferred to Amtrak, the Plan reserved to Conrail "appropriate trackage rights for the operation of commuter services." ECF No. 8-5 at 3.[1]

Under the Plan, Conrail conveyed to Amtrak the "Northeast Corridor Properties," which include rail lines running from Washington to Boston, and from Philadelphia to Harrisburg. *See* ECF No. 8-6 at 7-9. To ensure that Conrail retained trackage rights on these properties, Amtrak granted it a "Commuter Service Passenger Easement." *See* ECF No. 8-7.

The parties' easement agreement gave Amtrak a right of first refusal. It stated that if Conrail "elect[s] to abandon or assign the Commuter Passenger Service Easement, in whole or in part, other than to a subsidiary, affiliate or successor entity, [Amtrak] shall have a first option to acquire such easement, or portion thereof, at the purchase price of one dollar ($1.00)." *Id*. at 7.

Using this easement, Conrail began providing commuter passenger services on behalf of regional transport authorities like SEPTA. *See* ECF No. 8-1 at 9. But in 1981, Congress found that the 3R Act and Conrail had "failed to create a self-sustaining railroad system in the Northeast" and had "cost United States taxpayers many billions of dollars over original estimates." 45 U.S.C. § 1101(1). To remedy this failure, Congress passed the Northeast Rail Service Act ("NERSA"), which, among other things, relieved Conrail of its commuter service obligations. *See* 45 U.S.C. § 744(a). NERSA gave regional transport authorities two choices: they could either "operate [their] own commuter service" or "contract with Amtrak Commuter for the operation of such service." *See* 45 U.S.C. § 586.

---

[1] All citations are to the page numbers generated by this Court's CM/ECF system.

SEPTA chose door number one. *See* Compl. 6; ECF No. 8-1 at 10. Section 506 of NERSA states that a commuter authority choosing to operate its own service "may initiate negotiations with Conrail for the transfer of commuter service operated by Conrail." 45 U.S.C. § 586(b)(1). Section 506 requires that "[a]ny transfer agreement between [SEPTA] and Conrail shall specify . . . the rail properties to be conveyed." *Id*. § 586(b)(2). It defines "rail properties" as "assets or rights owned, leased, or otherwise controlled by Conrail, other than real property, which are used or useful in rail transportation service." *Id*. § 586(h).

As required by Section 506, Conrail and SEPTA began negotiations for a transfer of certain properties, including the Commuter Service Passenger Easement. *See* Compl. 7. What happened next is the crux of the parties' dispute. SEPTA argues that Conrail successfully transferred the easement to it through a "Transfer Agreement" signed by both parties in 1982. *See* ECF No. 8-1 at 11-12; ECF No. 8-8. Amtrak disagrees. It contends that, by the easement's clear terms, "Conrail had no authority to convey the Commuter Easement" without offering Amtrak a first option to purchase the easement. Compl. 7. Amtrak suggests that it exercised this option, bought the easement, and won an arbitration that confirmed the legality of its acquisition. *Id*. at 7-8. And because Amtrak "possessed the fee that was burdened by the Easement," it argues, the purchase terminated the easement. *Id*. at 8.

SEPTA contends that the Court lacks jurisdiction to resolve this dispute for two reasons. ECF No. 8-1 at 17. First, it suggests that the 3R Act proscribes judicial review of any rights reserved by the Final System Plan to Conrail. *Id*. at 18. Second, it argues that NERSA bars judicial review of any transfers made by Conrail under Section 506. *Id*.

3

**II.**

The Court must dismiss Amtrak's claims if it lacks subject matter jurisdiction to consider them. Fed. R. Civ. P. 12(b)(1). When a defendant moves to dismiss under Rule 12(b)(1), the plaintiff bears the burden of establishing the Court's jurisdiction. *See Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007). In conducting its review, the Court accepts as true all factual allegations in the complaint. *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007). It also gives the plaintiff "the benefit of all favorable inferences that can be drawn from the alleged facts." *Id.* Beyond the complaint, it may consider "undisputed facts plus the [C]ourt's resolution of disputed facts." *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992).

**III.**

At this early junction, Amtrak has met its burden of establishing the Court's jurisdiction. Consider first the 3R Act. True, the Act limits judicial review of the Final System Plan to "matters concerning the value of the rail properties to be conveyed under the plan and the value of the consideration to be received for such properties." 45 U.S.C. § 719. And it is also true that Amtrak is not seeking judicial review of the value of any rail properties or the consideration paid or received for such properties.

But viewed in the light most favorable to Amtrak, the Complaint does not ask the Court to review the Final System Plan at all. Rather, Amtrak seeks judicial review of an easement and a related operating agreement it made with Conrail. Amtrak alleges that it "granted to Conrail certain easements and rights on the [Northeastern Corridor] Properties, which included a Commuter Passenger Service Easement." Compl. 4. It states that the easement gave Amtrak a right of first refusal if Conrail tried to transfer the easement. *Id.* And it alleges that it executed

its purchase option and extinguished the easement. *Id*. at 8. Assessing the merits of these claims does not require the Court to review the Final System Plan or any of the rail properties it conveys.

SEPTA's arguments to the contrary are unpersuasive. It contends that the easement "was explicitly intended to memorialize [Conrail's trackage rights] set forth in the [Plan]." ECF No. 8-1 at 9. Perhaps. But if the easement merely memorializes these pre-existing rights, then the Plan itself granted Amtrak a right of first refusal, as this right is unambiguously set forth in the easement. *See* ECF No. 8-7 at 7.

SEPTA tries to elude this conclusion by suggesting that the easement's right of first refusal clause constituted an impermissible modification of the Final System Plan. ECF No. 14 at 12-3. But the Plan itself derails this argument. It says only that, "[a]s to lines designated over to Amtrak, [the Plan] reserves to [Conrail] appropriate trackage rights for the operation of commuter services." *See* ECF No. 8-5 at 3.

The Plan does not describe the form these "trackage rights" must take. It does not, for example, specify whether Amtrak may lease the rail properties to Conrail rather than grant an easement. Nor does it prohibit Conrail from entering into any agreements with Amtrak about the assignability or transferability of these trackage rights. The Plan, in other words, does not clearly prohibit the right of first refusal agreed upon between the parties. It is a review of this contractual agreement that Amtrak seeks. Thus, giving Amtrak "the benefit of all favorable inferences that can be drawn" from the facts it alleges, the Court finds that it can proceed to the merits of the parties' dispute without falling afoul of the 3R Act's bar on judicial review. *Wright*, 503 F. Supp. 2d at 170.

SEPTA also argues that NERSA prohibits judicial review of Amtrak's claims. Section 507 of NERSA states that "[t]ransfers of properties . . . pursuant to agreements negotiated under [Section 506] . . . shall not be subject to judicial review." 45 U.S.C. § 587. Because Conrail and SEPTA entered an agreement for the transfer of Conrail's easement under Section 506, SEPTA argues, NERSA precludes the Court from reviewing that transfer. *See* ECF No. 8-1 at 13.

Not so. To begin with, Sections 506 and 507 of NERSA were repealed by Congress in 1994. *See* P.L. 103-272. SEPTA suggests that these sections "remain binding as to transfers of rail property that occurred" before the repeal. ECF No. 8-1 at 13 n.11. SEPTA points to the text of the repeal statute, which states that the "laws specified in the following schedule are repealed, *except for the rights and duties that matured* . . . before the date of enactment of this Act." *Id*. (citing P.L. 103-272) (emphasis added). SEPTA argues that the "rights and duties" it obtained from Conrail "fully matured" when Conrail transferred the easement to SEPTA. *Id*.

But it is unclear whether a jurisdiction stripping provision can create "rights and duties" that mature before its repeal. As Amtrak notes, while "the repeal language suggests Congress intended to preserve substantive rights, there is nothing in the language [of the statute] that suggests Congress intended to preserve non-substantive provisions like Section 507." ECF No. 13 at 19.

More, even if Section 507 does apply, the Court may still review Amtrak's claims. Section 507 bars review of transfers of rail properties under Section 506. Section 506, in turn, defines rail properties as "assets or rights owned, leased, or otherwise controlled by Conrail." 45 U.S.C. § 586. Amtrak alleges, in effect, that Conrail did not "own[], lease[], or otherwise control[]" the easement. And because it did not possess this easement, Amtrak argues, Conrail could not legally transfer it under Section 506. Amtrak, in other words, seeks judicial review of

6

a precedent condition necessary for a Section 506 transfer to occur.  NERSA does not prohibit the Court from considering this predicate question.

To hold otherwise would, as Amtrak highlights, lead to absurd results.  Take the following scenario as an example.  Near the train tracks in a town are several houses.  Conrail agrees to transfer the tracks—which it owns—and an individual's house—which it does not—to a regional transit authority.  The parties sign an agreement stating that this transfer is being executed under Section 506 of NERSA.  If SEPTA's argument is correct, the individual property owner would have no legal recourse to assert ownership of his house.  Nothing in NERSA's text or structure suggests that Congress intended this bizarre result.

**IV.**

In short, the Court is satisfied, based on Amtrak's allegations, that it will be able to reach the merits of the parties' arguments without violating either the 3R Act or NERSA.  It is therefore

**ORDERED** that SEPTA's Motion to Dismiss, ECF No. 8, is DENIED; and it is further

**ORDERED** that Amtrak's Motion for a Hearing, ECF No. 15, is DENIED as moot.

**SO ORDERED**.

Dated: July 11, 2019  TREVOR N. McFADDEN, U.S.D.J.