**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**NATIONAL RAILROAD PASSENGER
CORPORATION**,

Plaintiff,

v.

**SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY**,

Defendant.

Case No. 1:19-cv-00537 (TNM)

## <u>MEMORANDUM OPINION</u>

For over thirty years, the National Railroad Passenger Corporation ("Amtrak") and

Southeastern Pennsylvania Transportation Authority ("SEPTA") cooperated to provide SEPTA

access to rail properties along the northeast corridor for its commuter services. That cooperation

has now jumped the rails. At the crux of the parties' dispute is whether SEPTA possesses an

easement to access these properties.

Each party seeks summary judgment on this issue. Amtrak claims that SEPTA does not

own the easement because Amtrak exercised a right of first refusal that prevented the

Consolidated Rail Corporation ("Conrail") from conveying the easement to SEPTA. SEPTA

takes a different track. It claims that Amtrak could not prevent SEPTA from obtaining the

easement under various federal rail statutes and, even if it could, the right of first refusal did not

apply here. SEPTA also contends that Amtrak's effort to enforce its purported rights is too late.

Separately, SEPTA asserts a statutory right to access these rail properties even without

the easement. Amtrak responds that the Surface Transportation Board ("Board"), not this Court,

should resolve that question in the parties' parallel proceeding pending before it.

The Court will partially grant each party's summary judgment motion.  None of the federal rail statutes barred Amtrak from exercising its right of first refusal, which applied here to divest Conrail and, by extension, SEPTA of the easement.  Nor has the train left the station on Amtrak's claim:  Amtrak did not need to pursue this action until SEPTA relied on the easement to access the northeast corridor properties, which happened in 2015.

SEPTA is also entitled to partial summary judgment.  The Board does not have the expertise or authority to determine whether SEPTA has a statutory right to access the northeast corridor properties.  But the Board can (and already has) issued the injunctive relief SEPTA seeks, so the Court lacks jurisdiction to grant that relief here.

### I.[1]

Amtrak offers rail passenger service throughout the country, and SEPTA provides regional commuter transportation in Southeastern Pennsylvania and surrounding areas in New Jersey and Delaware.  *See* Parties' Joint Statement of Undisputed Material Facts ("JSUMF") ¶¶ 1–2, ECF No. 30-3.  They both operate on the northeast corridor, a 450-mile railroad line from Boston to Washington, D.C.  *Id.* ¶ 3.

In the early 1970s, major railroads in the northeast filed for bankruptcy.  *Id.* ¶ 5.  So Congress passed the Regional Rail Reorganization Act ("3R Act") to reorganize the railroads in that region.  *Id.* ¶¶ 9–10.  The Act created Conrail to provide commuter services in the northeast. *Id.* ¶ 11.  Under a "Final System Plan," Conrail could acquire and operate the bankrupt railroads' lines.  *See id.* ¶ 14; 45 U.S.C. § 716.  The Final System Plan also required Conrail to convey some properties to other rail authorities, including Amtrak.  JSUMF ¶ 14.  For these rail

---

[1]  The facts provided are undisputed.  *See* Parties' Joint Statement of Undisputed Material Facts, ECF No. 30-3.

properties, the Final System Plan reserved to Conrail "appropriate trackage rights for the operation of commuter services" over those lines. *Id.* ¶ 15 (cleaned up).

Next, Congress enacted the Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. 94–210, 90 Stat. 31 ("4R Act"), which confirmed implementation of the Final System Plan. *Id.* ¶¶ 21–22. The 4R Act also provided that Conrail need not offer rail passenger service "if a State (or a local or regional transportation authority) contracts for such service to be provided on such properties by an operator other than [Conrail]." 4R Act § 804 (currently codified at 45 U.S.C. § 744(e)(6)). Under that circumstance, the 4R Act stated that Conrail "shall, where appropriate, provide such operator with access to such properties for such purpose." *Id.*

As the Final System Plan required, Conrail transferred to Amtrak rail lines and properties along the northeast corridor in the Philadelphia area ("NEC properties"). *Id.* ¶¶ 24–25. Conrail reserved access and use rights for its commuter services in the NEC properties through a "Commuter Passenger Service Easement" ("Commuter Easement"). *Id.* ¶ 26. The Commuter Easement allowed Conrail to "operate commuter passenger trains, cars and locomotives" and "to provide commuter passenger service to the extent required." *Id.* ¶ 27. Conrail could use terminals and stations on the NEC properties "for such commuter passenger service." *Id.*

The Commuter Easement also provided a right of first refusal to Amtrak. *Id.* ¶ 28. It states that "in the event that the Grantor [Conrail] shall elect to abandon or assign the [Commuter Easement] . . . other than to a subsidiary, affiliate or successor entity, the Grantee [Amtrak] shall have a first option to acquire such easement, or portion thereof, at the purchase price of one dollar ($1.00)." *Id.*

3

Congress then put the brakes on the 3R Act. It found that the 3R Act "'failed to create a self-sustaining railroad system in the Northeast region of the United States,'" and "'cost United States taxpayers many billions of dollars over original estimates.'" *Id.* ¶ 35 (quoting 45 U.S.C. § 1101(1)). So Congress passed the Northeast Rail Service Act of 1981, Pub. L. 97–35, 95 Stat. 643 ("NERSA") to fix the problem. *Id.* ¶ 36. NERSA terminated Conrail's obligation to offer commuter services and provided for the "transfer of Conrail commuter service responsibilities to one or more entities whose principal purpose is the provision of commuter service" by January 1, 1983. *Id.* ¶ 37 (cleaned up). Local commuter authorities could operate their own commuter services or contract with Amtrak Commuter—a new entity created to replace Conrail as a commuter authority—if they chose not to. *Id.* ¶¶ 38–39. NERSA provided that "a commuter authority may initiate negotiations with Conrail for the transfer of commuter services operated by Conrail." *Id.* ¶ 40 (cleaned up); *see also* NERSA § 506(b)(1). Any agreement between Conrail and the commuter authority "shall specify at least—(A) the service responsibilities to be transferred; (B) the rail properties to be conveyed; and (C) a transfer date not later than January 1, 1983."[2] JSUMF ¶ 40 (cleaned up); *see also* NERSA § 506(b)(2).

Following NERSA, SEPTA informed Conrail and Amtrak Commuter that it would operate its own commuter service. JSUMF ¶ 41. SEPTA and Conrail then entered into a transfer agreement under which Conrail agreed to convey the Commuter Easement to SEPTA through a quitclaim deed. *Id.* ¶¶ 42–43.

Amtrak objected to the transfer of the Commuter Easement. *Id.* ¶¶ 47–48. It sent a letter to Conrail stating that it was exercising its right of first refusal and tendered one dollar for the

---

[2] The Court will refer to the 3R and 4R Acts and NERSA collectively as the "federal rail statutes."

Commuter Easement.[3]  *Id.* ¶ 51.  Conrail replied that it believed it must convey the Commuter Easement to SEPTA and returned the dollar to Amtrak.  *Id.* ¶ 52.  Conrail then executed a quitclaim deed purporting to convey the Commuter Easement to SEPTA, and SEPTA recorded the deed in the Office for Recording Deeds for each applicable county.  *Id.* ¶¶ 53, 55.

Amtrak contested the transfer in an arbitration with Conrail before the National Arbitration Panel ("Panel").  *Id.* ¶ 56.  SEPTA was not party to this arbitration.  *Id.* ¶ 57.  The Panel found for Amtrak, so Conrail sent Amtrak a quitclaim deed for the Commuter Easement and provided a copy to SEPTA.  *Id.* ¶¶ 58, 61.  SEPTA, however, twice declined to quitclaim the Commuter Easement to Amtrak.  *Id.* ¶¶ 60, 63.

Despite their dispute over the Commuter Easement, SEPTA and Amtrak have entered into agreements governing SEPTA's access to rail properties in the northeast corridor since 1980.  *Id.* ¶¶ 65–83.  With Conrail's commuter obligations ending under NERSA, Amtrak and SEPTA entered into an access and service agreement providing that "Amtrak shall permit SEPTA access to the [northeast corridor] and provide the type and level of services currently provided to SEPTA by Conrail."  *Id.* ¶¶ 70, 72 (cleaned up).  SEPTA paid $795,000 per month "for use of [northeast] corridor facilities and for provision of services and train operations" under this agreement.  *Id.* ¶ 73.  The parties renewed the agreement annually and it remains in effect, with SEPTA continuing to make payments to Amtrak.  *Id.* ¶¶ 74–75.

Amtrak and SEPTA also executed a thirty-year lease agreement covering train stations in the NEC properties ("station lease").  *Id.* ¶¶ 76–81.  The parties discussed an extension of the station lease in 2015, but their negotiations reached an impasse.  *Id.* ¶¶ 84–85.  During their

---

[3]  Amtrak also tendered one dollar to exercise its right of first refusal for another easement not at issue here.  JSUMF ¶ 51.

negotiations, SEPTA asserted ownership of the Commuter Easement as a separate basis to access the train stations without the station lease.  *See* Answer to Pl.'s Compl. ("Answer") ¶ 52, ECF No. 18 ("SEPTA admits it took (and takes) the position it has a property right to use the stations and related property pursuant to the Commuter Easement[.]").

Amtrak then sued SEPTA, seeking a declaration that SEPTA does not possess the Commuter Easement.  Compl. ¶¶ 58–69, ECF No. 1.  SEPTA moved to dismiss the complaint for lack of subject matter jurisdiction.  *See* Def.'s Mem. of Law in Supp. of Def.'s Mot. to Dismiss Pl.'s Compl., ECF No. 8-1.  It argued that the 3R Act prohibits judicial review of the rights the Final System Plan reserved to Conrail and that NERSA precludes judicial review of any transfers by Conrail.  *See id.* at 17–19.[4]

Meanwhile, SEPTA filed a petition with the Board, JSUMF ¶ 86, which can decide disputes over compensation between Amtrak and commuter authorities such as SEPTA for access to the NEC properties, *id.* ¶ 87.  In its petition, SEPTA asks the Board to "enter an order prescribing the terms of an agreement to govern SEPTA's continued use of passenger rail stations to provide essential commuter rail service" on the northeast corridor and to determine compensation for that continued use.  *Id.* ¶ 88 (cleaned up).

The Court denied SEPTA's motion to dismiss.  *See Nat'l R.R. Passenger Corp. v. Se. Pa. Transp. Auth.*, 393 F. Supp. 3d 1 (D.D.C. 2019).  It found that the 3R Act's limitation on judicial review of the Final System Plan did not apply because "[a]ssessing the merits of [Amtrak's] claims does not require the Court to review the Final System Plan or any of the rail properties it conveys."  *Id.* at 3–4.  The Court found unpersuasive SEPTA's argument that the Commuter Easement impermissibly modified the Final System Plan, reasoning that the plain language "does

---

[4]  All citations are to the page numbers generated by this Court's CM/ECF system.

not clearly prohibit the right of first refusal agreed upon between the parties." *Id.* at 4.  The Court also held that NERSA's jurisdictional bar was inapplicable because Amtrak asks the Court to determine whether Conrail could legally transfer the Commuter Easement in the first place, "a precedent condition necessary for a Section 506 transfer to occur." *Id.* at 5.  "NERSA does not prohibit the Court from considering this predicate question." *Id.*

SEPTA then filed two counterclaims.  *See* Counterclaim, ECF No. 18.  The first seeks a declaration that SEPTA possessed the Commuter Easement, *id.* ¶¶ 77–93, and the second seeks a declaration that the Final System Plan and the federal rail statutes give SEPTA a right to use the NEC properties without the Commuter Easement, *id.* ¶¶ 94–104.  SEPTA also asks for an injunction "requiring Amtrak to allow SEPTA to continue to access and use the [NEC properties] . . . subject to reasonable conditions to be agreed upon with Amtrak, or by the [Board] if SEPTA and Amtrak are unable to agree." *Id.* at 36.

The parties cross-move for summary judgment.  Amtrak's main contention is that SEPTA has never possessed the Commuter Easement because Amtrak properly exercised its right of first refusal before Conrail conveyed the Commuter Easement to SEPTA.  Pl.'s Mem. in Supp. Mot. for Summ. J. ("Pl.'s Mem.") at 24–38, ECF No. 30-2.  It also argues that the Board, not this Court, should determine whether SEPTA has a statutory right to use the NEC properties without the Commuter Easement.  *Id.* at 47–50.  On the other track, SEPTA claims ownership of the Commuter Easement because Amtrak waited too long to enforce its rights under the right of first refusal.  Mem. Law in Supp. of Def.'s Mot. for Summ. J. & Opp'n to Amtrak's Mot. for Summ. J. ("Def.'s Mem.") at 27–33, ECF No. 32-1.  It also argues that the Final System Plan and federal rail statutes barred Amtrak from exercising its right of first refusal and, alternatively, that Conrail's conveyance of the Commuter Easement did not trigger that right.  *Id.* at 33–44.

7

The parties' cross-motions are ripe for disposition.[5]

## II.

To succeed on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "material" if it could alter the outcome of the suit under the substantive governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (cleaned up). Once the movant makes this showing, the non-moving party bears the burden of setting forth "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (cleaned up).

## III.

The parties' cross-motions require the Court to resolve two questions. First, does SEPTA possess the Commuter Easement? Second, if it does not, does SEPTA have a separate statutory right to use the NEC properties? The Court addresses each question in turn.

---

[5] The Court has already found that it has jurisdiction to resolve this dispute. *See Nat'l R.R. Passenger Corp. v. Se. Pa. Transp. Auth.*, 393 F. Supp. 3d 1 (D.D.C. 2019). The Court also can resolve the parties' cross-motions for summary judgment without oral argument and thus denies the parties' requests for a hearing. *See* LCvR 7(f).

**A.**

The parties dispute ownership of the Commuter Easement.  Amtrak claims that SEPTA never obtained the Commuter Easement because Amtrak exercised its right of first refusal before Conrail conveyed the Commuter Easement to SEPTA.  *See* Pl.'s Mem. at 24–38.  SEPTA disagrees.  First, it contends that Amtrak's invocation of the Commuter Easement is time-barred under the statute of limitations or laches.  Def.'s Mem. at 27–33.  Alternatively, SEPTA argues that the federal rail statutes and Final System Plan barred Amtrak from utilizing the right of first refusal and, in any event, its transfer agreement with Conrail did not trigger it.  *Id.* at 33–47.

**1.**

Amtrak's right of first refusal provides:

> [I]n the event that the Grantor [Conrail] shall elect to abandon or assign the [Commuter Easement], in whole or in part, other than to a subsidiary, affiliate or successor entity, the Grantee [Amtrak] shall have a first option to acquire such easement, or portion thereof, at the purchase price of one dollar ($1.00).

JSUMF ¶ 28.  Under its terms then, Amtrak could invoke the right of first refusal if Conrail elected (i) "to abandon" the Commuter Easement or (ii) to "assign" it to an entity other than a "subsidiary, affiliate or successor."  *Id.*  Conrail's conveyance satisfied this second condition. And once the condition was met, Amtrak properly exercised its right of first refusal by tendering one dollar to purchase the Commuter Easement.  *Id.*

**a.**

Conrail elected to assign the Commuter Easement to SEPTA.  Under its transfer agreement with SEPTA, Conrail agreed to convey the Commuter Easement to SEPTA through a quitclaim deed.  JSUMF ¶¶ 42–43.

SEPTA argues that Conrail made no such election.  It was instead compelled to do so under NERSA.  Def.'s Mem. at 38–39.  To SEPTA, "Conrail had no choice but to transfer the

9

Commuter Easement and other rail properties to SEPTA at SEPTA's request." *Id.* at 39.  Under this reading, the right of first refusal was never triggered.  But this argument stretches NERSA too far.

NERSA only provides that SEPTA "may initiate negotiations with Conrail for the transfer of commuter service operated by Conrail."  NERSA § 506(b)(1); *see also* JSUMF ¶ 40 (cleaned up).  And that in any agreement they reach that they "specify" the "service responsibilities to be transferred" and the "rail properties to be conveyed."  NERSA § 506(b)(2); *see also* JSUMF ¶ 40 (cleaned up).  NERSA goes no further.  It confers no unfettered right for SEPTA to demand and receive whatever it wishes from Conrail, including the Commuter Easement.  Nor does it automatically extinguish Conrail's pre-existing contractual obligations. *Accord Consol. Rail. Corp. v. Metro. Transp. Auth.*, No. 95 CIV. 2142 (LAP), 1996 WL 137587, at *15 (S.D.N.Y. Mar. 22, 1996) (concluding that NERSA "[r]elieving Conrail of the financially draining obligation to provide commuter services did not, *ipso facto*, terminate the rights and responsibilities of Conrail" under pre-existing agreements).

To be sure, SEPTA and the U.S. Department of Transportation pressured Conrail to convey the Commuter Easement.  *See* JSUMF ¶ 50.  And Conrail believed then that it had to do so.  *Id.* ¶ 52.  But the statute's text, not Conrail's subjective belief, controls.  *Cf. Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("As we have repeatedly held, the authoritative statement is the statutory text, not the legislative history or any other extrinsic material.").  And the text states only that *negotiations* "may" take place between SEPTA and Conrail "for the transfer of commuter services."  NERSA § 506(b)(1); *see also* JSUMF 40 (cleaned up).  Congress left to the parties how (and what) rail properties would be conveyed. *Metro. Transp. Auth.*, 1996 WL 137587, at *15 ("Details of how Conrail would withdraw its

services, how a new provider would step in, and even who that provider would be, were not resolved by NERSA.").  Nothing in the text suggests that these negotiations abrogated Conrail's prior obligations.  *Id.* (concluding that "[w]hatever decisions were made" under NERSA, "there was further work to be done . . . on terms that would have to be negotiated by reference" to Conrail's pre-existing agreements).  The conveyance of the Commuter Easement was not automatic.

Since NERSA did not obligate Conrail to convey the Commuter Easement, its choice to do so was an election to assign under the right of first refusal.

**b.**

The next question is whether SEPTA was Conrail's "subsidiary, affiliate or successor entity."  JSUMF ¶ 28.  If it was, then the right of first refusal did not apply to Conrail's conveyance.  The parties agree that SEPTA was not a subsidiary or affiliate of Conrail.  *Id.* ¶ 44.  So the Court need only decide whether SEPTA was a "successor entity" to Conrail.  It was not.

"Successor entity" is not a defined term in the Commuter Easement.  But "a word is known by the company it keeps."  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).  This "commonsense" canon—known as the doctrine of *noscitur a sociis*—"counsels that a word is given more precise content by the neighboring words with which it is associated."  *Freeman v. Quicken Loans, Inc.*, 566 U.S. 624, 634–35 (2012) (cleaned up).  If several terms "are associated in a context suggesting that [they] have something in common, they should be assigned a permissible meaning that makes them similar."  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) (hereinafter *Reading Law*).

That principle applies here.  "Successor entity" directly follows "subsidiary" and "affiliate" in the right of first refusal.  The term "subsidiary" has a "precise and commonly

11

understood definition[] in corporate law." *Rothstein v. Am. Int'l Grp., Inc.*, 837 F.3d 195, 210 (2d Cir. 2016) (citing Del. Code Ann., tit. 8 § 220). "Affiliate" also describes a "corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." *Affiliate*, Black's Law Dictionary (11th ed. 2019). Indeed, the Commuter Easement uses the term "affiliate" elsewhere with "parents" and "subsidiaries." JSUMF ¶ 27 ("[A]ny agreement which Grantor [Conrail], its parent, subsidiaries, or affiliates is required to assume or enters into. . . .). So the term connotes a corporate relationship to Conrail.

In this context, the Court interprets "successor entity" in the right of first refusal to mean Conrail's corporate successor—a "corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." *Successor*, Black's Law Dictionary (11th ed. 2019). That way, "subsidiary, affiliate and successor" are similar in meaning.

SEPTA invokes a broader definition of successor entity. It argues that successor as used in the right of first refusal means "one that follows" or "[o]ne who succeeds to the rights or the place of another." Def.'s Mem. at 40 (cleaned up). According to SEPTA, it qualifies as a successor entity because it assumed Conrail's commuter operation. *Id.* ("SEPTA is the successor entity to Conrail by assuming and continuing Conrail's commuter operation in the Philadelphia region as directed by Congress.").

The Court declines to adopt that interpretation. Recall that both "affiliate" and "subsidiary" in the Commuter Easement connote corporate associations with Conrail. SEPTA's definition of "successor," however, would encompass entities with no such association. A mere contract with Conrail would suffice. That definition ascribes a meaning that is "so broad that it is inconsistent with its accompanying words." *Gustafson*, 513 U.S. at 575.

SEPTA's broader definition of "successor" also renders the right of first refusal meaningless. By its terms, the Commuter Easement only applies to commuter services. It allowed Conrail access to the NEC properties to "operate commuter passenger trains, cars and locomotives" and "to provide commuter passenger service to the extent required." JSUMF ¶ 27 (cleaned up). Conrail could use terminals, stations and other equipment on the NEC properties for "such commuter passenger service." *Id.* (cleaned up). Thus, only entities that offer commuter services can obtain the Commuter Easement. And they would all qualify as "successors" under SEPTA's definition. This interpretation cannot be true because Amtrak could then never invoke its right of first refusal.[6] *See Keepseagle v. Perdue*, 856 F.3d 1039, 1047 (D.C. Cir. 2017) (avoiding "interpretive gloss" that "would yield absurd results"); *see also Reading Law* at 176 ("If a provision is susceptible of (1) a meaning that . . . deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred.").

Alternatively, SEPTA argues that it is Conrail's corporate successor. Def.'s Mem. at 40–41. It notes that, at the time of its transfer agreement with Conrail, the United States owned 85% of Conrail's shares. *Id.* at 41. As the controlling owner, the United States could designate "portions of Conrail's operations to be transferred to successor entities," which Congress did through NERSA. *Id.* SEPTA again overstates NERSA's terms. NERSA only provides that commuter authorities such as SEPTA "may initiate negotiations with Conrail," and that in any agreement they reach that they specify the "service responsibilities" and "rail properties" to be

---

[6] SEPTA is therefore incorrect that Amtrak can use the right of first refusal to prevent transfer of the Commuter Easement to a "non-commuter authority." Def.'s Mem. at 44. No such transfer could occur because the Commuter Easement grants access only for the purpose of commuter services. JSUMF ¶ 27.

transferred.  NERSA § 506(b); *see also* JSUMF ¶ 40 (cleaned up).  It left the parties to decide

what, if any, "portions of Conrail's operations to be transferred."  Def.'s Mem. at 41.

Even if NERSA did require Conrail to transfer some operations to SEPTA, neither party

understood the transfer agreement to create a corporate successor relationship.  The parties

provided that the transfer agreement "shall inure to the benefit of and bind the respective

successors of Conrail and [SEPTA]."  Pl.'s Mem. Ex. 19 ("Transfer Agreement") at 63, ECF No.

30-22.  If SEPTA was to be the successor to Conrail after the transfer, this provision would be

unnecessary.  *See U.S. ex rel. K&R Ltd. P'ship v. Mass. Housing Fin. Agency*, 456 F. Supp. 2d

46, 56 (D.D.C. 2006) ("The Court construes contracts in a manner that gives effect to the words

used by the parties, and assumes that the parties intend every part of a contract to mean

something, so that no word, clause, sentence, or phrase is rendered surplusage, superfluous,

meaningless or nugatory." (cleaned up)).[7]

SEPTA therefore was not a "successor entity" to Conrail.  So Conrail's attempt to convey

the Commuter Easement to SEPTA triggered the right of first refusal.

### c.

Having determined that the right of first refusal was triggered, the Court must next

determine whether Amtrak properly exercised that right.  It did.

Amtrak informed Conrail in writing that it was exercising the right of first refusal.

JSUMF ¶ 51.  And it tendered the requisite dollar to purchase the Commuter Easement.  *Id.*  So

---

[7]  The same principle applies under Pennsylvania law, which governs the transfer agreement.
*See* Transfer Agreement at 66; *Randal v. Jersey Mortg. Inv. Co.*, 158 A. 865, 866 (Pa. 1932)
("[O]ur unbending rule that all the words of a contract are to be given an appropriate meaning
and none are to be treated as surplusage, unless no other course is reasonably possible.").

Conrail did not possess the Commuter Easement when it executed the quitclaim deed to SEPTA ten days later. *Id.* ¶ 53.

SEPTA does not argue otherwise in its combined summary judgment motion and opposition. *See* Pl.'s Opp'n to Def.'s Mot. for Summ. J. & Reply in Supp. Pl.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 34, ECF No. 35 ("SEPTA does not dispute that Amtrak properly exercised its [right of first refusal] if it was indeed triggered[.]").  In its reply, however, SEPTA suggests for the first time that Amtrak did not exercise its right of first refusal because Conrail rejected the dollar payment.  Def.'s Reply in Supp. Mot. for Summ. J. ("Def.'s Reply") at 20, ECF No. 37; *see also* JSUMF ¶ 52.

The Court rejects this argument as untimely because "[i]ssues may not be raised for the first time in a reply brief."  *Rollins Env't Servs. (NJ) Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) (citing cases).

In any event, the Court finds that Conrail could not decide whether to receive payment for the right of first refusal.  If Conrail could decline the payment, it would hold a permanent veto over Amtrak's exercise of the right of first refusal.  Conrail then, not Amtrak, would own the right.  The Court declines to adopt this interpretation.  *See Keepseagle*, 856 F.3d at 1047.

**2.**

Even if Amtrak could exercise the right of first refusal, SEPTA argues that the right still did not apply to Conrail's conveyance for two reasons.  First, SEPTA maintains that Amtrak's claim to enforce the right of first refusal is untimely under the statute of limitations or laches. Def.'s Mem. at 27–33.  Second, SEPTA claims that the right of first refusal impermissibly infringes on its statutory right to the Commuter Easement.  *See id*. at 33–38.  Neither argument is persuasive.

**a.**

The first stop is SEPTA's statute of limitations challenge.  SEPTA contends that Amtrak's cause of action is too late because it "arose no later than September 1983," when SEPTA refused to provide a quitclaim deed of the Commuter Easement to Amtrak.  *Id.* at 28.  "Amtrak knew unequivocally that SEPTA asserted its easement rights," but failed to enforce its right then.  *Id.*  The Court disagrees.

A statute of limitations begins to run "when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief."  *Cal. Pub. Emps.' Ret. Sys. v. ANZ Secs., Inc.*, 137 S. Ct. 2042, 2049 (2017) (cleaned up).  Amtrak seeks a declaration that "SEPTA does not own the Commuter Easement and thereby may not use the Commuter Easement as justification for its continued access to the NEC Properties" after the station lease expires.  *See* Compl. ¶ 69.  The relevant question, then, is when could Amtrak first pursue this declaratory relief?

True, the parties disputed whether SEPTA owned the Commuter Easement in 1982.  *See* JSUMF ¶¶ 46–52.  And that "Amtrak had knowledge in 1982 of the grounds it now uses to challenge the conveyance."  Def.'s Reply at 22.  But there was no need for Amtrak to assert its right to the Commuter Easement against Amtrak then.  *Cf. Burne Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 164 (2d Cir. 2003) ("Potential defendants are not required to seek at the earliest opportunity a declaration that a defense to a claim not yet brought is valid.").  The parties executed multiple agreements controlling SEPTA's access to the northeast corridor and NEC properties without relying on the Commuter Easement.  JSUMF ¶¶ 65–83.  Under one agreement—which remains in effect today—SEPTA pays $795,000 per month to access the northeast corridor to "provide the type and level of services" that Conrail provided.  *Id.* ¶¶ 72–75.  The parties also executed the station lease to ensure SEPTA's access to train stations in the

NEC properties, an agreement which lasted over thirty years.  *Id.* ¶¶ 76–83.  It was not until 2015 when the parties' negotiations over the station lease renewal reached an impasse did Amtrak need to pursue this declaration.[8]  *Id.* ¶¶ 84–85.

Indeed, if SEPTA is correct, then its first counterclaim—"a declaration that it possesses the Commuter Easement"—must also be untimely.  Counterclaim ¶ 93.  SEPTA knew that Amtrak asserted the right of first refusal as early as 1982.  JSUMF ¶¶ 47–48.  And SEPTA, like Amtrak, waited over thirty years to enforce its purported rights to the Commuter Easement.  So the same logic would bar SEPTA's claim as well.[9]

The Federal Arbitration Act's ("FAA") statute of limitations also does not apply here. *See* Def.'s Mem. at 27 ("Amtrak cannot judicially enforce that award now because the Federal Arbitration Act required Amtrak to confirm that award within one year.").  Amtrak does not seek to enforce the Panel's decision under the FAA.  Nor does that decision undergird Amtrak's claim.  The Court can (and will) grant the declaratory relief Amtrak seeks without giving any legal effect to that decision.

---

[8] Amtrak also points to its agreements with SEPTA to show that "SEPTA's conduct is inconsistent with its assertion of ownership of the Commuter Easement."  Pl.'s Mem. at 33–38. Amtrak argues that "[h]ad SEPTA possessed the Commuter Easement, it would not have agreed to the terms in these agreements."  *Id.* at 37.  Perhaps.  But SEPTA points to the same language to argue that these agreements "were *authorized* by, and *consistent* with, the Commuter Easement."  Def.'s Mem. at 51.  The Court finds this evidence inconclusive at the summary judgment phase to support either party's position.  As explained, however, these later agreements undermine SEPTA's theory that Amtrak's cause of action is untimely.

[9] Any prejudice SEPTA suffered from Amtrak's delay to sue applies equally to Amtrak.  *See* Def.'s Mem. at 32–33.  Under SEPTA's theory, both parties sat on their rights for the same amount of time, during which relevant documents and witnesses became unavailable.  SEPTA also did not suffer prejudice from the repeal of NERSA's jurisdictional limitation, *see id.* at 32, which did not prevent the Court from resolving the dispute here, *Nat'l R.R. Passenger Corp.*, 393 F. Supp. 3d at 4–5.

The relevant events took place nearly forty years ago.  But the cause of action accrued no earlier than 2015, when the parties reached an impasse on the station lease renewal and SEPTA asserted its right to access the NEC properties through the Commuter Easement without the lease.  JSUMF ¶¶ 84–85; Answer ¶ 52 ("SEPTA admits it took (and takes) the position it has a property right to use the stations and related property pursuant to the Commuter Easement[.]").[10] SEPTA thus fails to show that this action is untimely.[11]

**b.**

The next and final stop is SEPTA's contention that it has a statutory right to the Commuter Easement.  Def.'s Mem. at 35.  It contends that this right trumps Amtrak's right of first refusal.  *Id.* at 33.  But the authority SEPTA relies on derails this theory.  At most, the Final System Plan and federal rail statutes confer a right for SEPTA to *access* the NEC properties.  But a right to access is distinct from a right to possess the Commuter Easement.

Consider NERSA.  SEPTA contends that this provision "directed that the Commuter Easement be transferred to SEPTA, rendering the [right of first refusal] inapplicable."  Def.'s Mem. at 36.  Not so.  NERSA allows SEPTA to "initiate negotiations with Conrail for the transfer of commuter service operated by Conrail."  NERSA § 506(b)(1); *see also* JSUMF ¶ 40 (cleaned up).  It only requires that any agreement "specify" the "service responsibilities to be

---

[10]  SEPTA also invokes NERSA to support its statute of limitations theory.  It argues that any claim to challenge Conrail's conveyance of the Commuter Easement accrued no later than January 1, 1983, NERSA's deadline for Conrail to enter agreements with commuter authorities such as SEPTA.  Def.'s Reply at 23.  Again, SEPTA misconstrues the relief Amtrak seeks here.  Amtrak does not contest the validity of Conrail's transfer.  It instead asks the Court to determine whether SEPTA can rely on the Commuter Easement to access the NEC properties without the station lease.  *See* Compl. ¶ 69.  That question only became ripe when the parties' negotiations over the station lease renewal broke down.  JSUMF ¶¶ 84–85.

[11]  The Court need not decide which statute of limitations applies, or whether to apply the doctrine of laches.  *See* Def.'s Mem. at 28–30.  Amtrak's claim was timely under either.

18

transferred" and the "rail properties to be conveyed."   NERSA § 506(b)(2); *see also* JSUMF ¶ 40 (cleaned up).   Nowhere does NERSA compel Conrail to convey the Commuter Easement.   *Cf. Metro. Transp. Auth.*, 1996 WL 137587, at *15.

The same is true of the Final System Plan.   As the Court explained, the Commuter Easement was not required for Conrail to secure "trackage rights" under the Final System Plan. *See Nat'l R.R. Passenger Corp.*, 393 F. Supp. 3d at 4 ("The [Final System] Plan does not describe the form these 'trackage rights' must take.   It does not, for example, specify whether Amtrak may lease the rail properties to Conrail rather than grant an easement.").   So too for SEPTA.   The Final System Plan may authorize commuter authorities like SEPTA to "purchase[] or lease[] from Conrail" properties "used or useful in passenger service."   45 U.S.C. § 716(c)(1)(D); *id.* § 702(14).   But it does not compel transfer of the Commuter Easement.

Finally, the 4R Act required Conrail, "where appropriate," to provide state, local or regional transportation authorities "access" to rail properties for rail passenger service.   4R Act § 804 (currently codified at 45 U.S.C. § 744(e)(6)).   The Commuter Easement may be sufficient to provide this "access," but it is not necessary.   A contract or lease can accomplish the same. More, if Amtrak divested Conrail of the Commuter Easement through the right of first refusal, it would not be "appropriate" for Conrail to provide the Commuter Easement to SEPTA.

Amtrak also may enter an agreement with SEPTA "to grant, acquire, or make arrangements for rail freight or commuter rail passenger transportation over, rights of way and facilities acquired" under the 3R and 4R Acts.   49 U.S.C. § 24903(a)(6).   Indeed, SEPTA has contracted with Amtrak to access train stations on the NEC properties through the station lease, which was in place for over thirty years.   JSUMF ¶¶ 76–83.

Even without the Commuter Easement then, SEPTA can still access the NEC properties. So the right of first refusal does not "defeat[]" its statutory rights under the Final System Plan or federal rail statutes.  *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224 (1986) ("If the regulatory statute is otherwise within the powers of Congress, therefore, its application may not be defeated by private contractual provisions.").

*      *      *

In sum, the Court finds that Conrail's attempt to convey the Commuter Easement to SEPTA triggered Amtrak's right of first refusal, which Amtrak properly exercised.  The Court will therefore grant Amtrak's summary judgment motion on its only count and deny summary judgment on SEPTA's first counterclaim.

**B.**

In its second counterclaim, SEPTA asks the Court for a declaration that the Final System Plan and federal rail statutes provide a right to access the NEC properties even without the Commuter Easement.  Counterclaim ¶ 104.  It also seeks an injunction "requiring Amtrak to allow SEPTA to continue to access and use the [NEC properties]. . . to provide commuter rail service, subject to reasonable conditions to be agreed upon with Amtrak, or by the [Board] if SEPTA and Amtrak are unable to agree."  *Id.* at 36.

Amtrak urges the Court to dismiss this counterclaim under the primary jurisdiction doctrine.  Def.'s Mem. at 47–50.  It argues that the Board is the proper authority to resolve this issue in the parties' proceeding pending before it.[12]  *Id.*  The Court disagrees as to the declaratory relief SEPTA seeks but agrees as to the requested injunctive relief.

---

[12]  The Board stayed the proceeding pending this case.  *See* Decision at 2-3, Dkt. No. FD 36281 (Surface Trans. Bd. Mar. 27, 2019).

The primary jurisdiction doctrine "comes into play whenever enforcement of [a] claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body."  *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956).  If the doctrine applies, "the judicial process is suspended pending referral of such issues to the administrative body for its views."  *Id.*

 "In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation."  *Id.*  Such purposes include "the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions" and "the expert and specialized knowledge of the agencies involved."  *Id.*

There is no "fixed formula" for deciding when to apply the doctrine.  *Id.*  Courts in this district generally consider four factors: "(1) whether the issue is within the conventional expertise of judges; (2) whether the issue lies within the agency's discretion or requires the exercise of agency expertise; (3) whether there is a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made."  *APCC Servs., Inc. v. WorldCom, Inc.*, 305 F. Supp. 2d 1, 13 (D.D.C. 2001).

Amtrak construes 49 U.S.C. § 24903(c) to be the sole source of SEPTA's asserted statutory right to access the NEC properties without the Commuter Easement.  *See* Pl.'s Mem. at 47 ("SEPTA identifies 49 U.S.C. § 24903(c) as the source of that 'statutory right.'").  This provision requires Amtrak and commuter authorities such as SEPTA to provide for "reasonable reimbursement of costs" in their agreements for access for commuter transportation.  49 U.S.C. § 24903(c).  If the parties cannot agree, Section 24903 states that the Board "shall order that the transportation continue over facilities acquired under the [3R Act] and [4R Act] and shall

determine compensation . . . for the transportation not later than 120 days after the dispute is submitted." *Id.* § 24903(c)(2).

Since "[c]ourts have little experience in cases determining terms or compensation for use of rail properties," Amtrak argues that the Board should decide SEPTA's second counterclaim under 49 U.S.C. § 24903(c). Pl.'s Mem. at 49. But Amtrak's theory is both too narrow (for how it construes the counterclaim) and too broad (for how it construes 49 U.S.C. § 24903(c)).[13]

 Section 24903(c) does not form the sole basis of SEPTA's second counterclaim. The statute is only one of several cited by SEPTA to support its declaratory relief. Counterclaim ¶ 104. SEPTA also relies on the 3R and 4R Acts, as well as the Final System Plan. *Id.* ¶¶ 100, 104. SEPTA states that the "substance of [its] statutory access right is detailed in Section 206(c) of the 3R Act, and Appendices C and D of the [Final System Plan], as confirmed by the 4R Act." Def.'s Reply at 10. The Court need not rely exclusively on 49 U.S.C. § 24903(c).

Even if SEPTA had invoked only Section 24903(c), the Board does not possess "special competence" to issue the declaratory relief SEPTA seeks here. Section 24903 limits the Board's authority to determining compensation. It states that the Board "shall determine compensation . . . for the transportation not later than 120 days" after the parties submit their dispute. *Id.* 49 U.S.C. § 24903(c)(2). To be sure, the Board can (and did) grant SEPTA access to the NEC properties during the compensation dispute. 49 U.S.C. § 24903(c)(2). But that authority ends when the compensation proceeding ends. *See* Decision at 3, Dkt. No. FD 36281 (Surface Trans.

---

[13] Amtrak claims that "SEPTA fail[ed] to address the substance of Amtrak's primary jurisdiction argument, so waives a substantive response." *See* Pl.'s Opp'n at 49 (cleaned up). If Amtrak asks the Court to treat the primary jurisdiction argument as conceded, *see* Standing Order ¶ 12(B), ECF No. 4, the Court denies that request. SEPTA offers several arguments why the doctrine does not apply here, including that Amtrak misconstrues and narrows the relief sought, Def.'s Mem. at 52, that resolution of this case does not affect the Board proceeding, Def.'s Reply at 28, and that Amtrak overstates the authority Section 24903 grants the Board, *id.* at 28–29.

Bd. March 27, 2019) ("Decision") (requiring Amtrak to provide SEPTA access to the NEC
properties "on an interim basis").  Section 24903 confers no power on the Board to determine
SETPA's statutory right to access the NEC properties after the compensation dispute is resolved.
That silence controls.

Declaratory relief also will not interfere with the Board proceeding, as Amtrak suggests.
*See* Pl.'s Mem. at 49; Pl.'s Opp'n at 50.  That proceeding focuses only on compensation.
SEPTA asks the Board to "limit SEPTA's costs."  *See* Pet. by SEPTA for Relief under 49 U.S.C.
§ 24903 at 1, Dkt. No. FD 36281 (Surface Transp. Bd. Mar. 11, 2019).  And the Board instituted
the proceeding only "to determine compensation for SEPTA's use of the [NEC properties]."
Decision at 3; *see also id.* at 2 ("Pursuant to 49 U.S.C. § 24903(c)(2), the Board will institute a
proceeding to determine compensation for SEPTA's use of the [NEC properties].").  Any
declaration will not conflict with or infringe on the compensation determination the Board will
reach in that proceeding.

Amtrak does not otherwise dispute that SEPTA has a statutory right to access the NEC
properties.  *See* Pl.'s Mem. at 39–40; Pl.'s Opp'n at 38.  And, as discussed, that right is clear.
*See, e.g.*, 45 U.S.C. § 716(c)(1)(D) (allowing SEPTA to "purchase[] or lease[] from Conrail" rail
properties); 4R Act § 804 (currently codified at 45 U.S.C. § 744(e)(6)) (providing that Conrail
"shall, where, appropriate" provide state, local or regional transportation authorities, such as
SEPTA, access to rail properties for rail passenger service).  SEPTA thus is entitled to summary
judgment on the declaratory relief sought in the second counterclaim.

SEPTA's requested injunctive relief, however, is different.  SEPTA asks for an injunction
to allow it to "continue to access and use the [NEC properties] . . . subject to reasonable
conditions to be agreed upon with Amtrak, or by the [Board] if SEPTA and Amtrak are unable to

agree." Counterclaim at 36. But Section 24903 expressly authorizes the Board to provide this relief. *See* 49 U.S.C. § 24903(c)(2) (requiring Board to "order that the transportation continue over facilities acquired under the [3R Act] and [4R Act]" until it (or the parties) resolve the compensation dispute pending before it). Indeed, the Board has already issued such an order in the parties' pending proceeding. *See* Decision at 3 (requiring Amtrak "to provide SEPTA access to the Stations on an interim basis"). An injunction here would infringe on the statutory powers that Congress delegated to the Board and duplicate a prior agency order. *See W. Pac. R.R. Co.*, 352 U.S. at 64. So SEPTA is not entitled to the injunctive relief it seeks under the second counterclaim.

*          *          *

The Court's decision will not strand commuters on train platforms along the northeast corridor, as SEPTA suggests. *See* Def.'s Mem. at 7 ("If allowed to succeed, Amtrak's effort would threaten the viability of a commuter rail service that millions of people use each year for their daily transportation needs."). SEPTA continues to have access to the NEC properties to provide commuter services and will do so after this litigation. *See* JSUMF ¶ 83; Decision at 3; 49 U.S.C. § 24903. The parties need only resolve what compensation SEPTA owes Amtrak for continued access to the NEC properties. The Board (or an agreement by the parties) is the proper authority to resolve that question.

## IV.

For these reasons, Plaintiff's motion for summary judgment will be granted in part and denied in part and Defendant's motion for summary judgment will be granted in part and denied in part. A separate Order will issue.

Dated: February 1, 2021                               TREVOR N. McFADDEN, U.S.D.J.